## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## WAYCROSS DIVISION

| | | |
|---|---|---|
| BRIGID CAPPELLETTI and SCOTT CHESLA, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 5:25-cv-00009-LGW-BWC |
| GEORGIA DEPARTMENT OF COMMUNITY AFFAIRS (DCA), CHRISTOPHER NUNN, in his official Capacity as Commissioner of DCA, WESLEY BROOKS, in his official capacity as Deputy Commissioner of Homeownership for DCA, GOVERNOR'S OFFICE OF PLANNING AND BUDGET (OPB), RICHARD DUNN, in his official capacity as Director of OPB, TREY BENNETT, in his official capacity as Director of the Grants Division and General Counsel of OPB, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

### BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Defendants Georgia Department of Community Affairs (DCA), Christopher Nunn, Wesley Brooks, Governor's Office of Planning and Budget (OPB), Richard Dunn, and Trey Bennett, through counsel, submit this brief in support of their motion to dismiss all claims that are asserted against them in Plaintiffs' complaint. Doc. 1.

### INTRODUCTION AND FACTUAL ALLEGATIONS

Plaintiffs Brigid Cappelletti and Scott Chesla are white homeowners who allege that they were discriminated against based on race because they did not receive funds from the Georgia

Mortgage Assistance program, which is administered by the Georgia Department of Community Affairs.[1] Doc. 1 at 2.

In March 2021, during the COVID-19 pandemic, Congress enacted the American Rescue Plan Act (the Act), which, among other things, established the Homeowner Assistance Fund (HAF), allowing for states to distribute funds to certain homeowners who have suffered financial hardship due to the pandemic. *Id.* at ¶¶ 29-32. The fund is managed by the U.S. Treasury. *Id.* Initially, the Treasury released 10% of the funds to the states to use in pilot programs. *Id.* To receive the rest of the funds, states were required to submit implementation plans to the Treasury for approval. *Id.*

Under the Act, the U.S. Treasury is required to prioritize the distribution of funds to two groups of people: 1) 60% of the funds must be used to assist homeowners with incomes at or below 100% of their area median income; and 2) states must prioritize the remaining funds to "socially advantaged individuals." *Id.* at ¶¶ 33-36; 15 U.S.C. § 9058d(c)(2). The Act does not define "socially disadvantaged individuals." *Id.* The Treasury, however, issued guidance to advise states on how to implement the HAF program. *Id.* at ¶¶ 37. In April 21, the Treasury guidance provided the following definition of "socially disadvantaged individuals":

> Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities. The social disadvantage must stem from circumstances beyond their control. There is a rebuttable presumption that the following individuals are socially disadvantaged: Black Americans, Hispanic Americans, Native Americans, and Asian Americans and Pacific Islanders. In addition, an individual may be determined to be a socially disadvantaged individual in accordance with the procedures set forth at 13 CFR 124.103(c) or (d).

---

[1] For purposes of this motion, the allegations in the complaint are accepted as true, but legal conclusions and unwarranted deductions of fact are not. *See American Dental Ass'n. v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010); *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009).

*Id.* at ¶¶ 37. In August 2021, the Treasury issued updated guidance on the definition of "socially disadvantaged individuals":

> Socially disadvantaged individuals are those whose ability to purchase or own a home has been impaired due to diminished access to credit on reasonable terms as compared to others in comparable economic circumstances, based on disparities in homeownership rates in the HAF participant's jurisdiction as documented by the U.S. Census. The impairment must stem from circumstances beyond their control. Indicators of impairment under this definition may include being a (1) member of a group that has been subjected to racial or ethnic prejudice or cultural bias within American society, (2) resident of a majority-minority Census tract; (3) individual with limited English proficiency; (4) resident of a U.S. territory, Indian reservation, or Hawaiian Home Land, or (5) individual who lives in a persistent-poverty county, meaning any county that has had 20% or more of its population living in poverty over the past 30 years as measured by the three most recent decennial censuses. In addition, an individual may be determined to be a socially disadvantaged individual in accordance with a process developed by a HAF participant for determining whether a homeowner is a socially disadvantaged individual in accordance with applicable law, which may reasonably rely on self-attestations.

*Id.* at ¶¶ 38.

DCA submitted its implementation plan to the U.S. Treasury in August 2021. *Id.* at ¶¶ 41. The plan was approved in January 2022 and DCA was awarded $354,185,231 in funds. *Id.* Under DCA's Georgia Mortgage Assistance program, homeowners are eligible for up to $50,000 in relief. *Id.* at ¶¶ 43.

According to Plaintiffs, DCA's plan submission included both the initial and revised Treasury definitions of socially disadvantaged individuals. *Id.* at ¶¶ 47. Plaintiffs also allege that "[i]n describing the quantitative data used in developing its program," the DCA plan stated that:

> Socially disadvantaged individuals are those that have been subject to racial or ethnic prejudice or cultural bias because of their identity. There is a rebuttable presumption that the following individuals are socially disadvantaged: Black Americans, Hispanic Americans, Native Americans, Asian Americans, and Pacific Islanders.

*Id*. According to Plaintiffs, in its plan, DCA automatically considered people to be socially disadvantaged individuals if they belonged to one of "DCA's preferred minority and ethnic groups." *Id*. Plaintiffs admit, however, that DCA's plan allowed white applicants to meet its definition of being socially disadvantaged merely by submitting an affidavit stating that they "identify as a Socially Disadvantaged Individual." *Id.*

Under its plan, DCA provides mortgage relief to homeowners who are considered socially disadvantaged individuals if their income is at or below 150% of the Area Median Income (AMI), and if they have met the other program requirements (financial hardship due to COVID-19 and other mortgage eligibility requirements). *Id.* at ¶¶ 3. For applicants who are not socially disadvantaged, they qualify if their income is at or below 100% AMI (again assuming the other program requirements are met). *Id.* at ¶¶ 4. According to Plaintiffs, DCA's program is racially discriminatory because members of designated racial and ethnic groups automatically qualify as being socially disadvantaged, while white homeowners with incomes between 100 and 150% AMI cannot obtain relief unless they "otherwise qualify as socially disadvantaged." *Id.* at ¶¶ 4, 56-57. Plaintiffs also allege that DCA marketed the program in a racially discriminatory way by targeting localities with concentrated populations of individuals who met the criteria for being socially disadvantaged. *Id.* at ¶¶ 50-54. Additionally, Plaintiffs make the conclusory and unsupported allegation that "[i]n reviewing and granting applications, DCA prioritizes applications based on race, prioritizing applications submitted by homeowners in DCA's preferred racial and ethnic groups over those submitted by white homeowners." *Id.* at ¶¶ 55.

Plaintiff Brigid Cappelletti is a white homeowner residing in Georgia. *Id.* at ¶¶ 67-69. She is a rigging electrician who works in the television and film industry. *Id.* at ¶¶ 70. During the pandemic, she contracted COVID-19 and developed "long COVID," leaving her unable to work

for several months, causing "a significant decrease in [her] income," and she entered a period of mortgage forbearance. *Id.* at ¶¶ 71-74. Cappelletti applied for mortgage assistance through DCA's program and her application was denied. *Id.* at ¶¶ 75-77. The complaint does not provide any specific information about Cappelletti's income, whether it fell between 100 and 150% AMI, nor does it provide whether Cappelletti's "period of forbearance" made her eligible for relief under the program, or whether she submitted the required mortgage documentation.[2] *Id.* at ¶¶ 67-69. Instead, the complaint alleges "upon information and belief" that DCA's denial of Cappelletti's application "was due to DCA's race-based criteria, including its prioritization of applications and distribution of funds," and that she "would have received financial assistance had DCA not discriminated on the basis of race." *Id.* at ¶¶ 78-79.

Plaintiff Scott Chesla is a white homeowner in Georgia. *Id.* at ¶¶ 82-84. He is an engineer who worked for a company in Arizona before the pandemic. *Id.* at ¶ 86. After the pandemic began, Chesla left his job in Arizona "due to increased risks of COVID-19" and the need to care for his wife and daughter, who both contracted COVID-19. *Id.* at ¶ 87. Chesla experienced a "significant decrease in income" and missed mortgage payments, falling more than a month behind on his mortgage. *Id.* at ¶¶ 89-91. Chesla applied for financial assistance through DCA's mortgage relief program but was denied. *Id.* at ¶ 94. As with Cappelletti, the complaint provides

---

[2] Plaintiffs' failure to provide information about whether Cappelletti's income fell between 100 and 150% AMI is critical. If Cappelletti fell under 100% AMI, she would have met the income requirements of the program regardless of whether she was a socially disadvantaged individual, and her denial could not have been based on race. In reality, and as Plaintiffs' counsel is aware, Cappelletti was denied because she failed to submit required mortgage documentation after repeated requests by DCA. Unfortunately, at this stage in the proceedings, we must rely on Plaintiffs' representations to the Court, which are unfounded.

no information on Chesla's income.[3] *Id.* at 82-92. Plaintiffs make the conclusory allegation "upon information and belief" that Chesla was denied because DCA discriminated based on race. *Id.* at ¶¶ 95-96.

Plaintiffs sue DCA and allege that the department "was awarded and is responsible for overseeing distribution" of the $354,185,231 in federal homeowner assistance funds from the U.S. Treasury. *Id.* at ¶¶ 16. Plaintiffs allege that DCA "developed the Georgia Mortgage Assistance program and currently markets and administers the program." *Id.*

Plaintiffs also sue the Georgia Office of Planning and Budget (OPB), which is a unit within the office of the Governor that oversees budget development and fiscal management for the state government. *Id.* at ¶¶ 19. Plaintiffs allege that OPB was "awarded and is responsible for overseeing distribution" of the *same* grant of U.S. Treasury funds that was received by DCA, the $354,185,231, which is not plausible. For that allegation, Plaintiffs cite to and rely on DCA's plan submission for the Georgia Mortgage Assistance program, but nowhere in the plan does it state that OPB was the ultimate recipient of the funds. *See* State of Georgia, U.S. Dep't of the Treasury, Homeowner Assistance Fund Plan HAFP-0102 (Dec. 21, 2021), https://perma.cc/KEN8-S5BN ("Georgia Plan Submission"). To the contrary, in the body of the complaint, Plaintiffs allege that DCA submitted the proposal to the U.S. Treasury, that "DCA was awarded $354,185,231 in HAF funds," and that DCA implemented the program. Doc. 1 at ¶¶ 41-65. Other than naming OPB as a party, the complaint does not make any allegations against OPB. *See* Doc. 1.

---

[3] Plaintiffs likely omitted this information from the complaint because Chesla, an engineer living in Alpharetta, one of the wealthiest cities in Georgia, was denied because his income exceeded the program's requirements.

Plaintiffs also sue four individual Defendants: Christopher Nunn, the Commissioner of DCA; Wesley Brooks, the Deputy Commissioner of Homeownership, who oversees the Georgia Mortgage Assistance program; Richard Dunn, the Director of OPB; and Trey Bennett, the Director of the Grants Division and General Counsel for OPB. *Id.* at ¶¶ 17-18, 20-21. These Defendants are being sued in their official capacities only. *Id.* Other than naming these individual Defendants, and providing their positions, the complaint does not make any allegations about their personal involvement in creating the allegedly discriminatory program, and the complaint provides no details about their specific involvement in implementing the program.[4]

Based on these allegations, Plaintiffs assert 1) a claim for racial discrimination in violation of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, and 2) a racial discrimination claim brought under 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment. *Id.* at ¶¶ 111-146. By way of relief, Plaintiffs seek compensatory damages under Title VI; nominal damages under Title VI and the Equal Protection Clause; a declaration that the Georgia Mortgage Assistance program violates Title VI and the Equal Protection clause; and an injunction "requiring Defendants to stop administering the program in a racially discriminatory manner, market the program on a race-neutral basis, consider previously denied applications on a race-neutral basis, and consider new applications on a race-neutral basis." *Id.* at 35-36.

As shown below, Plaintiffs' complaint should be dismissed for several reasons: 1) Plaintiffs cannot obtain the injunctive relief they seek; 2) the claims brought under 42 U.S.C. § 1983 are barred by the Eleventh Amendment, sovereign immunity, and the text of section 1983; 3) the individual Defendants cannot be sued under Title VI; 4) OPB cannot be sued under Title

---

[4] Plaintiffs have filed their complaint as a class action. Plaintiffs have until June 29, 2025, to file a motion for class certification. This motion deals only with the claims brought by the named Plaintiffs. Defendants reserve all objections to certifying a class in this matter.

VI because it was not the "recipient" of the federal funds; 5) Plaintiffs fail to state a claim for

violation of the Equal Protection Clause and Title VI; and 6) the individual Defendants are

entitled to qualified immunity.

## ARGUMENT AND CITATION OF AUTHORITY

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim

for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007);

*see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Conclusory allegations, including legal

conclusions couched as factual allegations, and unwarranted deductions of fact should be

ignored, and the remaining well-pleaded facts must plausibly suggest unlawful conduct. *Iqbal*,

556 U.S. at 678-80; *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009).

Though the complaint does not need to make detailed factual allegations, it may not merely

recite the elements of the cause of action in a formulaic or conclusory way. *See Twombly*, 550

U.S. at 555. Plaintiffs must allege facts showing the grounds for their entitlement to relief. *Id.*

This "requires more than labels and conclusions, and a formulaic recitation of the elements of a

cause of action will not do." *Id.*; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice.").

### A. Plaintiffs fail to state a claim for injunctive relief.

The named Plaintiffs have filed suit because their applications for mortgage relief were

denied. Plaintiffs' damages, if any, are purely monetary. Injunctive relief is not appropriate here

because a plaintiff seeking a permanent injunction must show: "(1) that it has suffered an

irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate

to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff

and defendant, a remedy in equity is warranted; and (4) that the public interest would not be

disserved by a permanent injunction." *eBay, Inc. v. MercExchange, L.L.C.* 547 U.S. 388, 391 (2006). The remedies available at law, monetary damages, are sufficient to compensate Plaintiffs for their alleged injuries, which is denial of *monetary* relief from the mortgage assistance program.

Furthermore, the pleadings do not show that Plaintiffs will be affected by the allegedly unlawful conduct in the future. "Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party shows 'a real and immediate—as opposed to a merely conjectural or hypothetical—threat of <u>future</u> injury.'" *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1328 (11th Cir. 2013) (citations omitted) (emphasis in original). When an injunction merely looks back at past harm, it needs to be denied. *Noorani Trading Inc. v. Bijani*, 2022 U.S. Dist. LEXIS 252539, *1-2 (N.D. Ga. 2022) (citations omitted). For the named Plaintiffs, the complaint only alleges past harm, not future harm. Thus, the complaint fails to state a claim for injunctive relief.

**B. Plaintiffs' claims brought under 42 U.S.C. § 1983 are barred by the Eleventh Amendment, sovereign immunity, and the text of section 1983.**

As asserted against DCA and OPB, and against the individual Defendants in their official capacities, the claims brought under 42 U.S.C. § 1983 and the Equal Protection Clause are barred by the Eleventh Amendment and the doctrine of sovereign immunity. These claims are also barred by the text of section 1983.

The Federal Constitution "specifically recognizes the States as sovereign entities," a basic attribute of which is immunity from private suits. *Alden v. Maine*, 527 U.S. 706, 713 (1999). The Eleventh Amendment thus bars suit against a state or one of its agencies, departments or officials, absent a waiver by the state or a valid congressional override, when the state is the real party in interest or when any monetary recovery would be paid from state funds. *See id.* at 745-

57; *Kentucky v. Graham*, 473 U.S. 159, 169 (1985); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 97-12 (1984). "The general test for determining whether the state is the real party in interest, even though it is not a named defendant, is whether relief sought against the nominal defendant would in fact operate against the state …." *Jackson v. Georgia Dep't of Transp.*, 16 F.3d 1573, 1577 (11th Cir. 1994) (citation omitted). Any monetary relief sought from DCA, OPB, and the individual defendants in their official capacities would operate against the state, and so any such claims are barred by the Eleventh Amendment and sovereign immunity. *See Zatler v. Wainwright*, 802 F.2d 397, 399-400 (11th Cir. 1986). Claims against state employees in their official capacities are effectively claims against the state itself. *Graham*, 473 U.S. at 165-166. The State of Georgia has not consented to be sued under 42 U.S.C. § 1983. Ga. Const. Art. I, Sec. 2, Par. 9(f). And Congress did not intend for section 1983 to disturb the immunity to states provided by the Eleventh Amendment or alter the federal-state balance. *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 65 (1989). Therefore, Plaintiffs' claims brought under section 1983 for money damages are barred by the Eleventh Amendment and sovereign immunity.

Plaintiffs' claims for declaratory and injunctive relief are also barred, not just the claims for money damages. While the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908), provides a limited exception to sovereign immunity for certain suits for injunctive relief against individual state officer defendants that are sued in their official capacities, it does not apply here. "The *Young* doctrine permits federal courts to entertain suits against state officers seeking prospective equitable relief to end continuing violations of federal law." See *McClendon v. Ga. Dep't of Community Health*, 261 F.3d 1252, 1256 (11th Cir. 2001). The doctrine applies only where *prospective* injunctive relief is sought, whereas here the complaint seeks monetary and injunctive relief to remedy alleged *past* violations of Plaintiffs' constitutional rights, and there is no

plausible fact allegation of an ongoing violation against the named Plaintiffs. Furthermore, as argued above, the complaint fails to state a claim for injunctive relief so the *Young* doctrine would not apply. Additionally, the complaint does not give any specifics about each individual Defendants' involvement in the allegedly unconstitutional program—whether they were responsible for creating it, and whether they have the authority to change it—so even if there was a claim for injunctive relief, there is no showing that the individual Defendants are the proper parties to enjoin. For all these reasons, Plaintiffs' claims brought under 42 U.S.C. § 1983 are barred by the Eleventh Amendment and sovereign immunity.

Moreover, the state entities and the individual Defendants in their official capacities are not "persons" subject to suit under section 1983. Section 1983 provides a cause of action for violations of federal constitutional or statutory rights by any "person" acting under color of state law. 42 U.S.C. § 1983. The Supreme Court has ruled that the term "person" in this context is to be given its ordinary meaning, and that "a State is not a 'person' within the meaning of § 1983." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 65 (1989). And the Court has explained that the term "state" includes individual state officers who are sued in their official capacity. *Id.* at 70-71. DCA, OPB, and the individual defendants sued in their official capacities are not "persons" and cannot be sued under section 1983.

**C. The individual Defendants cannot be sued under Title VI.**

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The statute makes it clear it only applies to programs or activities *receiving* Federal financial assistance, not individuals. *Shotz v. City of Plantation*, 344 F.3d 1161, 1169

(11th Cir. 2003). It is "beyond question" that "individuals may not be held liable for violations of Title VI because it prohibits discrimination only by recipients of federal funding." *Id.* Thus, the individual Defendants—Christopher Nunn, Wesley Brooks, Richard Dunn, and Trey Bennett— cannot be held liable under Title VI.

### D. Plaintiffs fail to state a claim against OPB.

Again, Title VI only applies to "programs or activities" that receive federal funds. 42 U.S.C. § 2000d. This means exactly what it means: under Title VI, Plaintiffs can only sue the program or activity that received the housing assistance funds from the U.S. Treasury. Plaintiffs specifically allege that DCA submitted the proposal to the U.S. Treasury and that "DCA was awarded $354,185,231 in HAF funds." Doc. 1 at ¶¶ 41. Plaintiff alleges that DCA, not OPB, discriminated against Plaintiffs because it distributed the mortgage assistance funds in a racially discriminatory manner. *Id.* at ¶¶ 41-146. And the complaint makes it clear that OPB is not a sub-unit of DCA. OPB is a unit within the Georgia Governor's office that that oversees budget development and fiscal management for the entire state government. *Id.* at ¶¶ 19. DCA is a separate state agency. *Id.* at ¶¶ 16. Other than naming OPB as a party, Plaintiffs do not make *any* allegations against OPB, not in the facts, and not in the asserted claims. OPB was not the "program or activity" that received the U.S. Treasury funds and cannot be sued under Title VI.

### E. The complaint fails to state a racial discrimination claim under both the Equal Protection Clause and Title VI.

The Equal Protection Clause of the Fourteenth Amendment provides "a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Among other things, the Equal Protection Clause prohibits invidious racial discrimination. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 205 (2023) ("SFFA"). Title VI of the Civil Rights Act prohibits discrimination on the

basis of "race, color, or national origin" by any "program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Racial discrimination that violates the Equal Protection Clause also violates Title VI when committed by a program that accepts federal funds. *SFFA*, 600 U.S. at 198 n.2 (quoting *Gratz v. Bollinger*, 539 U.S. 244, 276, n. 23 (2003)). Accordingly, Title VI and Equal Protection claims are governed by the same standard. *Arrington v. Miami Dade Cty. Pub. Sch. Dist.*, 835 Fed. Appx. 418, 420 (11th Cir. 2021) (citing *Elston v. Talladega Cty. Bd. of Educ.*, 997 F.2d 1394, 1405 n.11 (11th Cir. 1993) (Title VI provides no more protection than the Equal Protection Clause)).

To prove an Equal Protection claim, a plaintiff must show intentional discrimination, that the defendant's "decision or act had a discriminatory purpose and effect." *Burton v. City of Belle Glade*, 178 F.3d 1175, 1189 (11th Cir. 1999) (citations omitted); *Elston,* 997 F.2d at 1405 n.11 (the Equal Protection Clause and Title VI "bar only intentional discrimination"). Discriminatory intent can be shown when a law or policy overtly and expressly singles out a racial group for disparate treatment. *Miller v. Johnson*, 515 U.S. 900, 904–05 (1995). When there is no express racial classification or direct evidence of discriminatory purpose, courts use two tests for analyzing whether there was discriminatory intent, depending on the circumstances. Under the *Arlington Heights* test, which is most often used when the complaint is about disparate treatment of a group, discriminatory intent may be established by showing that racial discrimination was a "substantial or motivating factor" in the defendant's decision or action. *Id.* (citing *Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265-268 (1977) (identifying a variety of factors that are probative of intent to discriminate, including statistics demonstrating a clear pattern of discriminatory effect; the historical background and sequence of events leading up to the decision; and the relevant legislative or administrative history)). Under the *McDonnell*

*Douglas* test, which is most often applied in cases alleging discrimination in individual instances, a plaintiff has the initial burden of establishing discriminatory intent and must show 1) that he belonged to a protected group (e.g., a race); 2) that he was eligible for the recipient's program or activity; 3) that he was rejected from the program or activity; and 4) that similarly situated individuals with respect to eligibility for the program or activity, and not belonging to the plaintiff's racial group, were given better treatment. *Banks v. McIntosh Cty.*, 530 F. Supp. 3d 1335, 1367 (S.D. Ga. Mar. 30, 2021) (citing and discussing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-804 (1973)); *Lewis v. City of Union City*, 918 F.3d 1213, 1220-1223 (11th Cir. 2019) (discussing elements of prima facia case under the *McDonnell Douglas* test in the context of Title VII).[5] If a plaintiff can make this showing, then the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for [exclusion from the program or activity]." *Banks*, 530 F. Supp. 3d at 1367 (quoting *McDonnell Douglas,* 411 U.S. at 802). In applying the *McDonnell Douglas* test, the Eleventh Circuit has held that a plaintiff must demonstrate that the proffered comparators are "similarly situated in all material respects." *Lewis,* 918 F.3d at 1229.

Government policies that intentionally discriminate based on race are reviewed under strict scrutiny, where courts ask (1) "whether the racial classification is used to 'further compelling governmental interests" and, if so (2) "whether the government's use of race is 'narrowly tailored'—meaning 'necessary'—to achieve that interest." *SFFA*, 600 U.S. at 206-07 (citations omitted).

---

[5] Although initially designed for claims under Title VII (which prohibits employment discrimination based on race, religion, sex, and national origin), courts have applied the *McDonnell Douglas* test to cases brought under the Equal Protection Clause, and to other types of claims for intentional discrimination. The prima facie elements above are bespoke to claims brought under the Equal Protection Clause and Title VI.

Initially, the complaint fails to plead intentional discrimination based on race. Under the American Rescue Plan Act, the U.S. Treasury was *required* to prioritize distribution of 1) 60% of the funds to homeowners at or below 100% AMI; and 2) the remaining funds to "socially disadvantaged individuals." Doc. 1 at ¶¶ 33-36; 15 U.S.C. § 9058d(c)(2). The Defendants did not prioritize the funds to socially disadvantaged individuals. Congress did. Moreover, "socially disadvantaged individuals" is not, on its face, a racial classification. The U.S. Treasury provided guidance to the states on the definition of "socially disadvantaged individuals." *Id.* at ¶¶ 37-38. Plaintiffs allege that DCA's plan submission included the U.S. Treasury's initial and revised definitions. *Id.* at ¶¶ 47. Plaintiffs allege that, in addition to adopting the U.S. Treasury's definitions, DCA stated that "[s]ocially disadvantaged individuals are those that have been subject to racial or ethnic prejudice or cultural bias because of their identity," which is entirely consistent with the Treasury's definitions. *Id.* The Treasury's and DCA's definition of socially disadvantaged individuals included, *but was not limited to*, people who had been subject to racial prejudice, and it *also* included those who have been subject to cultural bias, which is not a racial classification. *Id.* DCA's plan states that "[t]here is a rebuttable presumption that the following individuals are socially disadvantaged: Black Americans, Hispanic Americans, Native Americans, Asian Americans, and Pacific Islanders." *Id.* But Plaintiffs admit that the program allowed white applicants to be considered socially disadvantaged merely by submitting an affidavit stating that they "identify as a Socially Disadvantaged Individual." *Id.* This is consistent with the U.S. Treasury's guidance that fund recipients can "rely on self-attestations" in determining whether a person is socially disadvantaged. *Id.* at ¶¶ 38. In sum, DCA did not create the allegedly discriminatory classification, "socially disadvantaged individuals" is not a racial

classification, whites can be considered socially disadvantaged under the plan by self-attestation, and Plaintiffs fail to state a claim for intentional discrimination.

To the extent that Plaintiffs attempt to base their claims on allegations of disparate impact alone, the Supreme Court has made clear that, like the Equal Protection Clause, Title VI prohibits intentional discrimination only, and there is no private right of action to enforce disparate impact claims under Title VI. *Alexander v. Sandoval*, 532 U.S. 275, 281, 285-286 (2001) (quotation marks omitted, alterations adopted).

Next, Plaintiffs have not plead facts showing that they are "similarly situated in all material respects" to non-whites who benefitted from the program. It bears emphasis that if Plaintiffs' incomes were at or below 100% AMI, then they cannot prove a claim for intentional racial discrimination, because they would have met the income requirements of the program regardless of whether they were socially disadvantaged. Boiled down, Plaintiffs' complaint is that DCA gives preference to racial and ethnic minorities because they automatically qualify as socially disadvantaged and can apply for mortgage relief if their income is between 100 and 150% AMI, but white homeowners cannot obtain relief if their income is between 100 and 150% AMI unless they "otherwise qualify as socially disadvantaged." *Id.* at ¶¶ 4, 56-57. Plaintiffs fail to plead that there are comparators—people who are "similarly situated in all material respects"—because the complaint provides no specific information, whatsoever, about Plaintiffs' incomes, nor does it say how they satisfied the other requirements of the program. Plaintiffs must plead that there were other individuals with the same income, and with the same status with respect to the other program requirements, who were given preferential treatment, which Plaintiffs have not done. If, for example, Plaintiffs' incomes were below 100% AMI, or above 150% AMI, or if they did not otherwise qualify for the program because their mortgage did not

qualify, or if they failed to provide the required documentation, then they could not have been denied based on the alleged racial discrimination. Most importantly, though, is that Plaintiffs do not even claim to be socially disadvantaged, and the complaint does not plead that they attempted to qualify as being socially disadvantaged by self-attestation, which they could have done. To be similarly situated, Plaintiffs would also need to plead facts showing that they are socially disadvantaged whites who submitted an affidavit to be considered socially disadvantaged, but were denied, and they were "similarly situated in all material respects" to non-whites who benefitted from the classification of being socially disadvantaged. Plaintiffs have not done so and their claims fail.

Next, Plaintiffs fail to state a claim against the individual Defendants because the complaint only provides their positions and does not make any allegations about their personal involvement in creating or operating the allegedly discriminatory program. Absent fact allegations showing the involvement of each individual Defendant in the alleged wrongdoing the pleading fails to state a claim because, for a section 1983 claim, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 566 U.S. at 676. The plaintiff must allege that each named Defendant participated in the alleged constitutional violation or exercised control or direction causing the violation. *See Gilmere v. City of Atlanta*, 774 F.2d 1495, 1504 (11th Cir. 1985). There must be an affirmative link between the Defendant's alleged conduct and the asserted constitutional violation. *See id.; and see also Douglas v. Yates*, 535 F.3d 1316, 1321-1322 (11th Cir. 2008) (*citing Pamel Corp. v. Puerto Rico Hwy. Auth.*, 621 F.2d 33, 36 (1st Cir. 1980) (stating that the complaint must "state with some minimal particularity how overt acts of the defendant caused a

legal wrong.")). As a basic pleading matter, Plaintiff has failed to allege facts showing that these individual Defendants engaged in conduct that violated the Equal Protection Clause and Title VI.

Finally, as stated above, other than naming OPB as a party, the complaint contains no allegations against OPB. Literally no facts are pleaded against OPB, not in the factual allegations, Doc. 1 at ¶¶ 29-98, and not in the claims for relief. *Id.* at ¶¶ 29-146. Instead, Plaintiff explicitly alleges that DCA applied for the funds, DCA received the funds, and that it was DCA's program. Again, Plaintiff must allege what actions were taken by each Defendant that violated the constitution. *Iqbal*, 566 U.S. at 676.

Plaintiffs fail to state a claim for violation of the Equal Protection Clause and Title VI against all Defendants and the claims should be dismissed.

### F. Qualified immunity bars Plaintiffs' claims against the individual Defendants.

The individual Defendants are entitled to qualified immunity as "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[6] *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998) (citation omitted). The test for qualified immunity is two pronged: (1) was the government official acting within the scope of his discretionary authority; and (2) did the official's conduct violate "clearly established law." *Maggio v. Sipple*, 211 F.3d 1346, 1350 (11th Cir. 2000). "Once the defendant establishes that []he was acting within h[is] discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284

---

[6] The individual Defendants acknowledge that Plaintiffs have sued them in their official capacities only, and that they are not entitled to qualified immunity when sued in their official capacities. Out of an abundance of caution, the individual Defendants raise the defense of qualified immunity to the extent that Plaintiffs are attempting to sue them in their individual capacities.

F.3d 1188, 1194 (11th Cir. 2002). To carry that burden, the plaintiff must show that the constitutional right asserted was clearly established at the time the alleged violation occurred. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

"A government official acts within his discretionary authority if his actions were (1) undertaken pursuant to the performance of his duties and (2) within the scope of his authority." *Mikko v. City of Atlanta, Georgia*, 857 F.3d 1136, 1144 (11th Cir. 2017). "In applying each prong of this test, [courts] look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Id.* "In other words, a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Id.*

The complaint makes clear that, at all times relevant to Plaintiffs' allegations, the individual Defendants were acting within their duties as Commissioner of DCA, Deputy Commissioner of Homeownership for DCA, Director of OPB, and Director of the Grants Division and General Counsel of OPB, and thus they were acting within the scope of their discretionary authority. The burden is on Plaintiffs to show that qualified immunity is not appropriate. Plaintiffs cannot make this showing because, as discussed above, they have not pleaded that the individual Defendants' actions violated their constitutional or statutory rights, and the allegations do not show a violation of clearly established law. Accordingly, the individual Defendants are entitled to qualified immunity and Plaintiffs' claims against them should be dismissed on this alternative basis.

## CONCLUSION

For the forgoing reasons, Defendants Georgia Department of Community Affairs (DCA), Christopher Nunn, Wesley Brooks, Governor's Office of Planning and Budget (OPB), Richard Dunn, and Trey Bennett ask that the Court grant their motion and dismiss all claims that are asserted against them in this action.

Respectfully submitted,

Christopher M. Carr                    112505
Attorney General

Loretta L. Pinkston-Pope              580385
Deputy Attorney General

Laura L. Lones                          456778
Senior Assistant Attorney General

/s/ William W. Peters
William W. Peters                      515342
Assistant Attorney General

/s/ Maigan J. Jenkins
Maigan J. Jenkins                      568725
Assistant Attorney General

PLEASE ADDRESS ALL
COMMUNICATIONS TO:
Maigan Jenkins
State Law Department
40 Capitol Square SW
Atlanta, GA  30334
Tel: (404) 585-8916
Fax: (404) 651-5304
Email: mjenkins@law.ga.gov

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I have on this day served the foregoing with the Clerk of Court using the CM/ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.

This 24th day of June, 2025.


<u>/s/ Maigan Jenkins</u>